1    **UNITED STATES DISTRICT COURT**

2                                  **DISTRICT OF MARYLAND**

3                OBED NORMAN                          25

                   Plaintiff PRO SE                   26    Case No    JRR 26 CV 00019

4

5    in his PERSONAL capacity as lead               27

6    collaborative PI                               28

7                        v.                          29    **COMPLAINT FOR**

8    DONALD J. TRUMP, in his official capacity as 30   **DECLARATORY AND**

9    President of the United States;               31    **INJUNCTIVE RELIEF**

10   DEPARTMENT OF GOVERNMENT                      32

11   EFFICIENCY

12   AMY GLEASON, in her official capacity as

13   Acting Administrator of the Department of

14   Government Efficiency.

15   NATIONAL SCIENCE FOUNDATION.

16   BRIAN STONE, in his official capacity as

17   Acting Director of the NSF.

18   LEE ZIA, Deputy Division Director NSF, Division

19   of Undergraduate Education.

20   LEAH MCALISTER-SHIELDS, Cognizant

21   Program Officer, NSF; Division of Undergraduate

22   Education

23   JAMES L. MOORE, III, NSF, Director of the

24   Directorate for Education and Human Resources.

+

USDC- BALTIMORE
'26 JAN 7 Aₓ10:14

HD

Rcv'd by: AB

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 4

A. Statement of the Case

B. Summary of Argument

C. Legal Issues Presented
D. Legal Framework

E. Legal Equivalence of Terminated Awards and Blocked Recommendations

F. Standard of Review

JURISDICTION AND VENUE .................................................................... 17

A. Standing

B. Jurisdiction Is Proper and Relief Is Warranted

THE PARTIES ............................................................................................ 11

    A.    Plaintiffs ............................................................................. 11

    B.    Defendants ......................................................................... 11

FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ............... 12

    I.    Plaintiff Dr. Obed Norman has, through decades of federal funding, made a significant contribution to research that benefits the public and effectuates NSF priorities ................................................................. 12

    II.    President Trump Issues a Flurry of Executive Orders and Creates DOGE, Unlawfully Directing Agencies to Terminate/Block Grants ............................................... 17

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

III.    Agencies that Terminated/Returned Grants/Proposals Have Acted According to a

Common Unlawful Pattern ................................................................................ 20

A.    National Science Foundation .................................................................. 22

1.    Congress Established the National Science Foundation to Promote

Scientific Research on a Broad Scale to Advance the United States'

National Interests ...................................................................... 22

2.    In Response to Trump Administration Directives, NSF Improperly

Changed Priorities and Blocked Recommended Grants ........................... 25

CLAIMS FOR RELIEF ............................................................................... 29

Count I – Violation of the Administrative Procedure Act (5 U.S.C. §§ 701–706)

Count II – Constitutional Violation (Separation of Powers / Appropriations Clause)

Count III – First Amendment Violation (Viewpoint Discrimination)

Count IV – Ultra Vires Agency Action

.................................................................................................. 35

PRAYER FOR RELIEF ............................................................................. 37

CONCLUSION

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    Plaintiff alleges for his Complaint against the below-named Defendants as follows

2

3    **<u>INTRODUCTION</u>**

4    1. This case for declaratory and injunctive relief is brought by Pro Se Plaintiff Dr Obed

5        Norman in his personal capacity. Plaintiff Norman is Principal Investigator (PI) of the

6        collaborative NSF research grant proposals in this case and the President and CEO of

7        STEMLIFE. STEMLIFE is a Maryland Education Research nonprofit and the lead

8        institution in the collaborative grant proposal (2500795 and 2500796) which is at issue

9        in this case. Plaintiff Norman and his Iowa State University colleagues applied for a $5

10       million collaborative grant from the National Science Foundation (NSF) for a project

11       titled REALSTEM on October 10, 2024. On June 14, 2025, eight months later, they

12       were notified by email that their proposals were 'returned without review' for not

13       meeting agency priorities. Press reports indicate our proposal was recommended for

14       funding by NSF during the normal review process, but it was flagged and returned

15       unfunded because DOGE officials had inserted themselves into the normal review

16       process and disqualified the proposals on discovering that the proposal contained words

17       such as 'diversity'.

18   2. The evidence also shows that the proposal had in fact been reviewed by expert

19       reviewers whose unanimous consensus -a unanimous consensus rarely achieved in NSF

20       proposal reviews- was that our proposal was 'good' and 'competitive'. Our prayer of

21       relief is that the court orders NSF to remand the recommendation for funding made to

22       the Division of Grants and Awards (DGA) in the normal review process as ordered by

23       the applicable court Temporary Restraining Order (<u>TRO-NY-v-Trump-1.31.25.pdf</u>).

24   3. In early **2025**, a federal court issued a TRO directing federal grant-making agencies,

25       including the National Science Foundation, to "… not pause, freeze, impede, block,

26       cancel or terminate … awards and obligations to provide federal financial aid.' In a

- 4 -

1    Memo from the Treasury, all federal agencies were advised as follows: <u>Proposal &</u>

2    <u>Award Policies & Procedures Guide (PAPPG) (NSF 24-1) | NSF - National Science</u>

3    <u>Foundation</u>

> Federal agencies cannot pause, freeze, impede, block, cancel, or terminate
> any awards or obligations on the basis of the OMB Memo, or on the basis
> of the President's recently issued Executive Orders. This prohibition
> applies to all awards or obligations—not just those involving the Plaintiff
> States in the above-referenced case—and also applies to future assistance
> (not just current or existing awards or obligations).

4.    Once a proposal has been forwarded to DGA, the DGA reviews the proposal for

technical and budget compliance and issues the official award which creates a binding

legal obligation on NSF. More importantly NSF has a legal obligation under the

Administrative Procedures Act (APA) to conduct the entire proposal review process in a

rational manner that is neither capricious nor arbitrary. These returns of proposals

recommended for funding were in breach of the TRO as it occurred pursuant to

Executive Orders or other directives of Defendant President Donald J. Trump, issued

from January 20, 2025 to the present. The TRO (*New York v. Trump*, No. 25-cv-39-JJM-

PAS (D.R.I Jan. 31, 2025), ECF No. 50) expressly enjoined federal agency defendants

from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise

impeding the disbursement of appropriated federal funds to the States under awarded

grants, executed contracts, or other executed financial obligations," based on both the

OMB directive and Executive Orders,  including the DEI and Gender Ideology

Executive Orders.

5. These unjustified returns of meritorious proposals recommended for funding were

implemented through Defendant Department of Government Efficiency ("DOGE") and

then operationalized by myriad administrative agencies. Plaintiff challenges these

proposal returns and seek a declaration that they are unconstitutional and otherwise

unlawful because they violate the bedrock constitutional principle of separation of

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1 powers; the First Amendment guarantee of free speech; the Fifth Amendment guarantee

2 of due process; the Impoundment Control Act of 1974; statutes requiring agencies to

3 fulfill congressionally defined missions; and the Administrative Procedure Act

4 ("APA"). These proposal returns bypassed Congress, ignored or contradicted the

5 purposes for which Congress created the granting agencies and had appropriated funds,

6 and dispensed with the regular procedures and due process afforded grant applicants

7 under the APA, in implementing the Trump Administration's political "cost-cutting"

8 and ideological purity agenda.

9 6. The process followed by NSF in this matter was not compliant with the TRO that was

10 adjudicated by the court. NSF initially decided not to review certain proposals. The

11 court then ordered that NSF review all submitted *proposals. This TRO gave proposal*

12 *submitters the right to have their proposals reviewed and obligated NSF to use those*

13 *revie*ws in evaluating the proposals. It is not normal NSF process to return proposals

14 without or despite a review after a review has already been conducted. Our position is

15 that in this matter NSF did not act in the normal way, as the court ordered it should. It is

16 inconceivable that the intention of the court was for NSF perfunctorily to complete the

17 reviews and then make decisions that did not take the reviews into consideration. NSF

18 also cannot require a particular focus for proposals and during the review disqualify

19 proposals that are consistent with the focus originally required by NSF. Proposers would

20 have invested years of effort and extensive resources to comply with specific

21 solicitation requirements, just to be informed that their proposals are being returned

22 because they are following those exact solicitation requirements.

23 7. Defendants impeded the proposal reviews process by stopping the normal process. The normal

24 process was as follows: On being submitted, the proposals were inspected for compliance with the

25 solicitations requirements as well as the Proposal & Award Policies & Procedures Guide (PAPPG)

26 regulations. after that, the proposals went through a rigorous review by expert reviewers. At that

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    point proposals that were not rated competitive are declined and the PIs are informed of the

2    declination. Proposals that were rated good and competitive are then forwarded to the NSF

3    division staff. At that point, the NSF staff decide which proposals they would recommend for

4    funding. Proposals recommended for funding would then be forwarded to the Division of Grants

5    and Awards (DGA). Only proposals recommended for funding are forwarded to the DGA.

6    According to press reports it was at that point that NSF stopped following the normal process.

7    This was also the point at which the DOGE staff impeded the process by removing the proposals

8    from DGA and returning the proposals recommended for funding to the principal investigators

9    with the message that the proposals did not effectuate agency priorities. This impeding of the

10    normal proposal review process was clearly prohibited by the TRO. Inserting the DOGE personnel

11    into the process was a requirement of OMB directive 2025. Implementing any OMB 2025

12    directive in the proposal review process was explicitly forbidden by the TRO. This impeding of

13    the proposal review process rises to contempt of court and  is sufficient ground for the court to

14    grant plaintiff's request for injunctive relief.

8.    Grants to researchers each year from federal agencies such as the National Science

Foundation, ranging from thousands to millions of dollars, fund the production of new

knowledge and fuel the development and deployment of discoveries useful to society.

9.    Federal grants have been key to the innovation that has consistently earned the United

States world leadership in STEM research and innovation.

10.    Before President Trump returned to office, federal agency grant-making proceeded

under the authority of Congress, which created agencies through its constitutionally

assigned exclusive legislative power, and appropriated taxpayer funds for specific public

purposes that the agencies were tasked to execute. For decades, agencies carried out

these statutory directives and observed due process in making, renewing, and (only

seldom) terminating grants or returning proposals without review. They each adhered to

their own grant regulations that were duly promulgated through notice and comment

rulemaking under the APA and followed APA procedures when modifying such

- 7 -

1      regulations.

2      11. As a corollary, on the rare occasions when agencies terminated grants or returned

3      proposals without review, they did so pursuant to predictable, regularized processes;

4      based such drastic steps on proper review and evaluation of grantees' and proposers'

5      activities to assure compliance with the terms and purpose of the awarded grants; and

6      took such drastic action only for reasons stated in applicable regulations.

7      12.    All of this changed abruptly on January 20, 2025, when Defendant Trump attempted to

8      seize direct control of federal agencies by bypassing Congress and upending the statutory and

9      regulatory system under which federal agencies have historically and legally operated.

10     13. On and after January 20, 2025, Defendants Trump and DOGE, through a flurry of

11     Executive Orders and other directives, commanded the federal agencies, such as the

12     NSF, to engage in actions to pause, freeze, impede, block, cancel, or terminate grants

13     and proposals despite having been court-ordered in a TRO that NSF "… not pause,

14     freeze, impede, block, cancel or terminate … awards and obligations to provide

15     federal financial assistance to the states, and … not impede the states' access to such

16     awards and obligations, except on the basis of the applicable authorizing statutes,

17     regulations and terms." NSF's actions in this case were in breach of all the stated

18     requirements of the TRO.

19     14.    Abrupt, wholesale, and unilateral termination of these grants and return of proposals has

20     violated the Constitution's core principle of separation of powers and its guarantees of freedom

21     of speech and due process; flouted the Impoundment Control Act limits on the Executive's ability

22     to withhold or redirect congressionally appropriated money; ignored statutory requirements that

23     agencies fulfill their substantive missions and fund congressionally-specified activities;

24     contravened agency-specific grant-making regulations that cannot by law be revised on an abrupt,

25     unexplained, chaotic basis; and violated the APA through this arbitrary, capricious, and *ultra*

26     *vires* conduct.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

15. Despite our repeated requests for the reasons why our proposal was returned, NSF has offered no explanation for its proffered reason. Communications made it clear that grants were being terminated and proposals returned to further Defendant Trump's political objectives, which included the elimination of research on "DEI" (diversity, equity, and inclusion), although the latter terms were not defined.

16. NSF returned proposals on a categorical, *en masse* basis, without individual review or regard to a project's merit, and without any semblance of due process. Our proposal was not returned because we were in violation of the terms of the published grant solicitation or strayed from the stated subject matter or purpose of the program. Such deficiencies could have been addressed in the normal and ordered course of grant-submission and review. To the contrary: these grant terminations were and are occurring, as their timing and reflection of the 2025 Executive Orders demonstrates, not because the research for which funding was approved had departed from its originally approved purpose, but because that purpose now offends the political agenda and ideological requirements of the Trump Administration.

17. Plaintiff does not seek an Order immunizing all proposals from ever being returned or changing agency grantmaking procedures as they existed prior to January 20, 2025. He does seek a return to the *status quo ante* of ordered grant processes, aligned with congressionally authorized purposes, and affording due process to grant recipients and proposers. This return to procedures that prevailed prior to January 20, 2025, and conformed to the norms of due process and the APA, by federal agencies that defer not to unilateral Executive dictates but to congressional authority, is the essential relief Plaintiff seeks. Such relief has already been granted to plaintiffs in federal court in California and confirmed by the 9th Circuit Appellate court.

18. Examining similar unlawful executive branch conduct by Defendants Trump and DOGE in the attempted reorganization (and gutting) of entire agencies, and the

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    mass termination of hundreds of thousands of federal employees, the United States

2    District Court (Illston, J.) stated in its May 22, 2025 Order Granting Preliminary

3    Injunction in *American Federation of Government Employees, AFL-CIO v. Trump,* Case

4    No. 25-cv-03698-51 (Dkt. 124):

> Presidents may set policy priorities for the executive branch, and agency heads may implement them. This much is undisputed. But Congress creates federal agencies, funds them, and gives them duties that—by statute—they must carry out. Agencies may not conduct large-scale reorganizations and reductions in force in blatant disregard of Congress' mandates, and a President may not initiate large-scale executive branch reorganization without partnering with Congress. For this reason, nine Presidents over the last one hundred years have sought and obtained authority from Congress to reorganize the executive branch. Other Presidents—including President George W. Bush, President Obama, and President Trump in his first term—asked Congress for agency reorganization authority but did not receive it.

18    In denying Defendants' request for a stay of the preliminary injunction in that case, the 4th Circuit

19    affirmed the bedrock principles that administrative agencies are creatures of Congress, not the

20    President, and that "Congress has plenary control over the salary, duties, and even existence of

21    federal offices." *Am. Fed'n of Gov't Emps. v. Trump,* —F.4th— (May 30, 2025) (citing *Free Enter.*

22    *Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477,500 (2010)).

23        19.  Here, Defendants have engaged in the same unprecedented and unlawful overreach

24    described and enjoined above, in the context of mass terminations of research grants and return

25    of grant proposals duly recommended for funding. Their playbook involves a trifecta of illegal

26    moves. First, Defendant Trump issued facially unconstitutional Executive Orders and directives

27    that usurped congressional authority and unlawfully discriminated against disfavored speech.

28    Second, acting on presidential instruction, Defendant DOGE commanded agencies to adopt

29    Trump's policies as their own by terminating scores of already awarded grants or proposals

30    recommended for funding, notwithstanding that DOGE (whose own status as a governmental

31    entity remains unclear) lacks legal authority to supervise administrative agencies. Third, and

32    finally, Federal Agency Defendants terminated grants and returned proposals on the stated basis

1    that they were inconsistent with *agency priorities*, or otherwise in tension with Executive Orders

2    and directives, when in fact the grants' inconsistency was with *executive preferences*. In so

3    doing, agencies violated their statutory mandates, the APA, the constitutional Due Process

4    guarantee, and their own regulations.

5        20.  Plaintiff and his associates have suffered concrete, professional, and other harms from

6        NSF's unilateral return of proposals to which they have already dedicated years of time and

7        effort; for research upon which they have staked careers and reputations; and for work with

8        research teams through which they endeavored to train a next generation. Without judicial relief,

9        these researchers will suffer irreparable injury to their research and their careers.

10    21.    Equally as profoundly, these terminations have impaired and will impair the public-

11    serving research mission of the nation and the concern for public welfare that undergirds

12    it. All of the Defendants' conduct, and the Plaintiffs' resulting harm, proceeds directly

13    from Defendant Trump's determination to erase the constitutional boundaries that separate

14    the branches of government and that assign defined powers to each. Specifically, the illegal

15    return of federal grant proposals that is the subject of this action proceeds from Defendant

16    Trump's efforts to arrogate the law-making powers of Congress to himself. Plaintiff will

17    continue to suffer harm on an ongoing basis and will experience increasing and irreparable

18    harm absent the declaratory and injunctive relief here sought.

19        22. NSF research proposals are expected to adhere to and comply strictly with the directives

20            set out in NSF's Proposal & Award Policies & Procedures Guide (PAPPG) and the

21            solicitation of the funding opportunity. In order to comply with APA requirements of

22            reasonable and rational decision-making, NSF therefore should judge proposals only

23            under the rules set out in the PAPPG and the requirements in the solicitation of that

24            particular competition. It is clearly unreasonable, after the proposals have been submitted,

25            for NSF to add new rules under which the submitted proposals will be judged as that

26            would clearly constitute an unfair and inappropriate decision-making process in breach of

- 11 -

1    the APA requirements for agency decision making to be reasonable and not arbitrary and

2    capricious. The DOGE team entered the review of our proposal at the stage when the

3    proposals had already been reviewed and recommended for funding. The timing of this

4    new review by DOGE is unreasonable on its face in addition to being in breach of the

5    TRO which required NSF to use its normal procedures in evaluating grant proposals. It is

6    also unreasonable that the new review by DOGE constituted an expectation that proposals

7    now be reviewed under agency priorities that were not spelled out before the proposals

8    were submitted. The decision-making by DOGE therefore does not meet the standard of

9    reasonable decision making that is required under the APA statute. In the declaratory

10   injunction we seek, we respectfully request that the court articulate this definition of

11   reasonable decision making. Both the sequence of the review process events and

12   introduction of new expectations are at odds with the APA requirements of reasonable

13   decision-making.

14   23. Plaintiff brings this action to vindicate his reliance and expectation interests built through

15   decades of federally supported research, and to remedy the concrete harms caused by

16   Defendants' actions—including disruption of ongoing studies, reputational injury, career

17   disadvantage, and the loss of public benefits intended for thousands of students and

18   educators. The relief sought will restore the integrity of NSF's review process, ensure

19   lawful consideration of Plaintiff's recommended proposal, and protect the

20   Congressionally mandated mission of advancing racial equity in STEM education.

21   **A. Statement of the Case**

22   24. Plaintiff, in partnership with Iowa State University and STEMLIFE, submitted a proposal

23   to the National Science Foundation's Racial Equity in STEM Education (RESTEM)

24   program that was formally recommended for funding by expert reviewers as an

25   innovative, tested intervention to close the achievement gap in STEM education. Despite

26   this recommendation, Defendants unlawfully blocked the proposal in violation of NSF

- 12 -

1    regulations, the Administrative Procedure Act, and a Temporary Restraining Order

2    prohibiting interference with NSF's merit-based review process. This action terminated

3    Plaintiff's reliance and expectation interests built through decades of federally supported

4    research, disrupted ongoing studies, damaged professional and institutional reputations,

5    and deprived students and educators of the public benefits Congress expressly mandated

6    NSF to advance. Plaintiff now seeks judicial relief to vacate Defendants' unlawful action,

7    compel NSF to resume its normal review process, and redress the concrete harms caused

8    by Defendants' interference.

9    **B.  Summary of Argument**

10    25. Defendants unlawfully interfered with the National Science Foundation's merit-based

11    review process by blocking Plaintiff's proposal after it was formally recommended for

12    funding. This action violated the Administrative Procedure Act, NSF regulations, and a

13    court-ordered Temporary Restraining Order, and it undermined Congress's express

14    mandate to advance racial equity in STEM education.

15    26. Plaintiff has Article III standing because the blocked recommendation caused concrete,

16    particularized, and ongoing harms, including disruption of ongoing research, reputational

17    injury, career disadvantage, and the loss of public benefits intended for thousands of

18    students and educators. These injuries are directly traceable to Defendants' unlawful

19    conduct and are redressable by judicial relief compelling NSF to resume its normal review

20    process.

21    27. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1346(a)(2), and venue lies in this

22    District under 28 U.S.C. § 1391(e). The Court has authority to grant declaratory and

23    injunctive relief under 28 U.S.C. §§ 2201–2202 and to award attorney's fees and costs

24    under 28 U.S.C. § 2412.

25    28. Accordingly, the Court should vacate Defendants' unlawful action, enjoin NSF to restore

26    the normal review process, and grant such other relief as is just and proper.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    **C. Legal Issues Presented**

2    29. Whether Defendants violated the Administrative Procedure Act, 5 U.S.C. §§ 701–706, by

3        arbitrarily and capriciously blocking Plaintiff's proposal after it was formally

4        recommended for funding through NSF's merit-based review process.

5    30. Whether Defendants' interference with NSF's established review procedures contravened NSF

6        regulations and exceeded lawful executive authority, thereby infringing Congress's appropriation

7        power.

8    31. Whether Defendants' actions violated a court-ordered Temporary Restraining Order that expressly

9        barred interference with NSF's proposal review and funding processes.

10   32. Whether Plaintiff has Article III standing by demonstrating injury-in-fact, causation, and

11       redressability arising from Defendants' unlawful conduct, including disruption of ongoing

12       research, reputational harm, and deprivation of public benefits.

13   33. Whether Plaintiff is entitled to declaratory and injunctive relief, vacatur of Defendants' unlawful

14       action, and attorney's fees and costs under 28 U.S.C. § 2412.

15   **D. Legal Framework**

16   1.  This action arises under the Constitution and laws of the United States, including the

17       Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, which authorizes judicial

18       review of agency action that is arbitrary, capricious, an abuse of discretion, or otherwise

19       not in accordance with law. The APA also requires agencies to act consistently with their

20       own regulations and established practices, and to provide reasoned decision-making that

21       respects reliance interests. See *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*

22       *Co.*, 463 U.S. 29, 43 (1983). While this case does not directly address reliance interests, it

23       highlights the importance of reasoned analysis in regulatory decisions which are

24       responsive to reliance interests.

25

- 14 -

2. Congress has expressly mandated that the National Science Foundation advance racial equity in STEM education and workforce development. NSF regulations and program solicitations implement this mandate by prioritizing proposals that provide unique solutions to systemic inequities. Agency action that disregards these priorities or blocks proposals recommended for funding without lawful justification contravenes both statutory and regulatory obligations.

3. Executive interference with NSF's merit-based review process also raises constitutional concerns. The separation of powers prohibits the Executive from encroaching upon Congress's appropriation authority. See *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Where agency conduct is undertaken ultra vires—beyond statutory authority—it is invalid and subject to vacatur. Moreover, agency action taken in violation of a court-ordered Temporary Restraining Order constitutes contempt of court and is subject to injunctive relief.

4. Finally, Plaintiff's reliance and expectation interests are protected under established precedent recognizing implied rights based on consistent agency practices. See *Perry v. Sindermann*, 408 U.S. 593 (1972). Blocking a proposal formally recommended for funding, after decades of NSF collaboration and support, unlawfully disregards those interests and constitutes arbitrary and capricious action under the APA.

**E. Legal Equivalence of Terminated Awards and Blocked Recommendations**

5. Plaintiff respectfully submits that to argue that the two cases (*Thakur and Norman*) differ because Thakur involves funded grants and Norman is about a grant application that was only recommended for funding but not funded, is as irrelevant to the core legal issues involved as distinguishing cases based on the geographic location of the researchers involved. Both cases are about unlawful interference with NSF's merit-based funding process which produce identical injuries to researchers. The two cases are indistinguishable in that both seek the implementation of an NSF decision that was arrived at legally and the

- 15 -

1    rejection of an NSF decision that was arrived at illegally. In Thakur the legally decided NSF

2    decision was to offer the award. In this case (Norman) the legally decided NSF decision

3    was to recommend the award for funding. The illegal NSF decision in Thakur was the

4    untimely termination of the award. The illegal NSF decision in the case at bar was the

5    decision to block the recommendation to fund the proposal. The core legal issues in this

6    case—violations of the First Amendment, non-compliance with APA, Ultra vires Executive

7    encroachment of Congress's appropriation authority and breach of NSF regulations—are

8    the exact same issues in Thakur. Additionally, the TRO was ordered in direct response to

9    Trump's freezing of proposal reviews and not in response to the terminated awards although

10    it applies to both. As stated, the Federal Department of Trade's advisory acknowledged that

11    the TRO also applies to future grants not yet awarded, affirming the applicability of

12    injunctive relief in both cases. The sole difference between Thakur and Norman is that NSF

13    grants are discretionary. This made it possible for Thakur, who had an awarded grant

14    terminated, to have successfully argued a protected property interest. Norman, with only a

15    recommendation for funding in hand, has no assertable protected property or constitutional

16    due process right. Plaintiff asserts no such rights in this case. Plaintiff only asserts the rights

17    conferred on him under the published agency regulations, APA, and other relevant statutes.

18    39. Even if the TRO only applied to awarded grants—which is not the case—the reliance

19    of Plaintiff on the APA is adequate to obtain the relief requested. The reference to the review

20    process is clear from the TRO statement that 'Defendants shall not impede the States' access

21    to such awards and obligations, except on the basis of the applicable authorizing statutes,

22    regulations, and terms.'

23    **F.  Standard of Review**

24    40. Agency action is subject to judicial review under the Administrative Procedure Act, 5

25    U.S.C. §§ 701–706. The APA requires courts to "hold unlawful and set aside agency

26    action, findings, and conclusions" that are arbitrary, capricious, an abuse of discretion,

- 16 -

1      or otherwise not in accordance with law; contrary to constitutional right; in excess of

2      statutory jurisdiction, authority, or limitations; or undertaken without observance of

3      procedure required by law. 5 U.S.C. § 706(2).

4      41. Under this standard, the Court must determine whether the agency examined the

5      relevant data, articulated a rational connection between the facts found and the

6      decision made, and acted consistently with its own regulations and established

7      practices. Agency action that disregards reliance interests, fails to consider important

8      aspects of the problem, or runs counter to the evidence before the agency is arbitrary

9      and capricious. See *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

10      U.S. 29, 43 (1983).

11      42. Courts also review agency action to ensure compliance with constitutional limits.

12      Executive interference that exceeds statutory authority or encroaches upon Congress's

13      appropriation power is ultra vires and invalid. Where agency conduct violates a

14      court-ordered injunction or TRO, such action is subject to vacatur and injunctive

15      relief.

16      43. Accordingly, the Court reviews Defendants' conduct under a deferential but searching

17      standard, ensuring that agency action is lawful, reasoned, and consistent with

18      constitutional and statutory mandates.

19      **JURISDICTION AND VENUE**

20      44. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this

21      action arises under federal law, including the United States Constitution, federal

22      statutes, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and 5

23      U.S.C. §§ 702, 704. An actual controversy exists between the parties within the

24      meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief,

25      injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1          5 U.S.C. §§ 705-06. Additionally, the Tucker Act Does Not Deprive the Court of

2          Jurisdiction

3      45. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because

4          Defendants are officers and agencies of the United States served in their official

5          capacities, no real property is at issue in this case, and the Plaintiff is a US citizen

6          resident of Baltimore, Maryland.

7   **A. Standing**

8          **A. Injury-in-Fact**

9      46. Professional and reputational injury, including career disadvantage and impairment of

10          protected reliance and expectation interests built through decades of collaboration

11          with NSF (see below)..

12    Plaintiff has suffered concrete, particularized, and ongoing harms as a direct result of Defendants'

13    unlawful interference with the NSF merit-based review process. These harms include:

14      47. The loss of opportunity to disseminate a proven intervention, rendering decades of

15          federally supported research effectively futile.

16      48. Disruption of ongoing studies and the inability to train younger researchers to carry

17          forward the intervention beyond the lifetimes of the current investigators (PI Norman,

18          age 80, and co-PI Shelley, age 75).

19      49. Deprivation of public benefits intended for thousands of students and educators under

20          Congress's express mandate to advance racial equity in STEM education.

21      50. These injuries are not conjectural; they are immediate, long-term, and irreparable

22          absent judicial relief. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)

23          (injury must be concrete and particularized, actual or imminent); *Perry v.*

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1       *Sindermann*, 408 U.S. 593, 601 (1972) (recognizing reliance and expectation interests

2       as protectable interests).

3       B.   Causation

4               The injuries described above are directly traceable to Defendants' unlawful conduct.

5       Specifically:

6       51. Defendant Trump's Executive Orders and directives unlawfully inserted political

7           criteria into NSF's review process.

8       52. Defendant DOGE commanded agencies to adopt these directives, despite lacking

9           lawful authority.

10      53. NSF officials implemented these directives by blocking Plaintiff's proposal after it

11          was formally recommended for funding, in violation of the Administrative Procedure

12          Act, NSF regulations, and a court-ordered Temporary Restraining Order.

13      54. The causal chain is clear: Defendants' actions disrupted the normal NSF review process and

14      directly produced Plaintiff's injuries. See *Allen v. Wright*, 468 U.S. 737, 751 (1984) (causation

15      requires injury to be traceable to challenged action);

16              C. Redressability

17              Plaintiff's injuries are redressable by judicial relief.

18      55. Vacatur of Defendants' unlawful action and injunctive relief compelling NSF to restore its normal

19          review process would remedy the blocked recommendation.

20      56. Such relief would enable Plaintiff to train younger researchers, ensure dissemination of the

21          intervention beyond the investigators' lifetimes, and restore the integrity of NSF's merit-based

22          review process.

- 19 -

1    57. Only judicial intervention can prevent the irreparable loss of Plaintiff's research legacy and the

2        public benefits Congress mandated NSF to advance.

3    58. See *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181–82 (2000) (redressability

4        satisfied where relief will likely remedy injury); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

5        *Ins. Co.*, 463 U.S. 29, 43 (1983) (APA requires reasoned decision-making and permits vacatur of

6        arbitrary agency action).

7    Irreparable Harm

8    59. Plaintiff will suffer irreparable harm absent injunctive relief. The unlawful blocking of Plaintiff's

9        proposal has already deprived him of the opportunity to disseminate a proven intervention and to

10        train younger researchers who could carry this work forward beyond the lifetimes of the current

11        investigators (PI Norman, age 80, and co-PI Shelley, age 75). Once this opportunity is lost, it cannot

12        be restored by monetary damages or post-hoc remedies. See *Winter v. Natural Resources Defense*

13        *Council, Inc.*, 555 U.S. 7, 22 (2008) (irreparable harm must be likely, not merely possible). The

14        harms are immediate and ongoing:

15    60. **Loss of dissemination:** Decades of federally supported research risk being rendered futile if the

16        intervention cannot be transmitted to future generations of scholars.

17    61. **Disruption of ongoing studies:** The blocked recommendation halts research midstream,

18        undermining continuity and progress.

19    62. **Professional and reputational injury:** Plaintiff's career and institutional standing are damaged in

20        ways that cannot be compensated for by damages. See *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (

21        holding that injunctive relief is appropriate after a court has determined that administrative appeal procedures

22        had been exhausted, agency action was not procedurally fair, and the court may consider irreparable harm as

23        a factor). In this case the Supreme Court also clarified that reputational injury typically constitutes

24        irreparable harm only when, as in Plaintiff's case, there is no adequate compensatory relief

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    available. Plaintiff Norman therefore can claim that he suffered reputational injury that meets the

2    legal definition of irreparable harm.

3    63. **Public interest deprivation**: Students and educators are denied the benefits Congress expressly

4    mandated NSF to advance, a harm that extends beyond Plaintiff to the broader public. See *League of*

5    *Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (the courts holding that irreparable harm

6    includes denial of the statutory rights and public benefits related to voting. Presumably this holding

7    applies to all statutory rights and public benefits).

8    64. These harms flow directly from Defendants' unlawful conduct and cannot be remedied by any relief

9    other than judicial intervention. The inability to train younger researchers is time-sensitive and

10    irreversible: once Plaintiffs are no longer able to continue their work, the intervention will be

11    permanently lost. Courts have consistently recognized that the loss of unique opportunities, reliance

12    interests, and constitutional rights constitutes irreparable harm. See *Elrod v. Burns*, 427 U.S. 347,

13    373 (1976) (loss of First Amendment freedoms, even for minimal periods, constitutes irreparable

14    injury); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (protecting reliance and expectation

15    interests).

16    65. Accordingly, Plaintiff has demonstrated irreparable harm sufficient to warrant injunctive relief.

17    Without judicial intervention, Plaintiff's research legacy, professional standing, and the public

18    benefits Congress mandated NSF to advance will be permanently extinguished.

19    **66. Balance of Equities**

20    67. The balance of equities tips sharply in Plaintiff's favor. Plaintiff faces immediate and irreparable

21    harm from Defendants' unlawful blocking of a proposal formally recommended for funding,

22    including the loss of dissemination of a proven intervention, disruption of ongoing studies,

23    reputational injury, and the inability to train younger researchers to carry forward the work beyond

24    the lifetimes of the current investigators. By contrast, Defendants suffer no legally cognizable harm

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    from being required to comply with the Administrative Procedure Act, NSF regulations, and a

2    court-ordered Temporary Restraining Order. See *Winter v. Natural Resources Defense Council, Inc.*,

3    555 U.S. 7, 24 (2008) (courts must balance competing claims of injury).

4    68. The equities weigh decisively toward preserving Plaintiff's reliance and expectation interests built

5    through decades of federally supported research, rather than permitting Defendants to continue

6    unlawful interference with Congress's appropriations and NSF's statutory mission. See *Amoco*

7    *Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987) (equitable relief appropriate where harm

8    to plaintiffs outweighs speculative harm to defendants).

9    **69. Public Interest**

10    70. Granting injunctive relief serves the public interest. Congress expressly mandated that NSF advance

11    racial equity in STEM education and workforce development. Blocking proposals recommended for

12    funding undermines this mission, deprives students and educators of public benefits, and erodes

13    confidence in the integrity of federal research funding. See  *Christensen v. Harris County (2000)*

14    (public interest is served by ensuring that government agencies act lawfully).

15    71. The public interest lies in restoring lawful, merit-based review processes, ensuring that taxpayer

16    funds are used for their congressionally authorized purposes, and protecting the dissemination of

17    interventions that close achievement gaps in STEM education. See *League of Women Voters v.*

18    *Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (public interest served by enforcing statutory rights).

19    Judicial relief will safeguard both the constitutional separation of powers and the public welfare

20    benefits Congress intended, ensuring that research designed to advance equity in STEM education is

21    not lost to unlawful executive interference.

22    **72. Injunctive Relief Standard**

23    73. Plaintiff satisfies the requirements for injunctive relief under Article III and the equitable principles

24    articulated in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

74. **Standing.** Plaintiff has Article III standing because Defendants' unlawful blocking of a proposal formally recommended for funding caused concrete, particularized, and ongoing harms. These include the loss of opportunity to disseminate a proven intervention, disruption of ongoing studies, reputational injury, career disadvantage, and the inability to train younger researchers to carry forward the work beyond the lifetimes of the current investigators (PI Norman, age 80, and co-PI Shelley, age 75). These injuries are not conjectural; they are immediate and irreparable. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (injury must be concrete and particularized, actual or imminent); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (recognizing reliance and expectation interests as protectable interests). The injuries are fairly traceable to Defendants' unlawful conduct, including unconstitutional Executive Orders, directives from DOGE, and NSF's implementation of those directives in violation of the APA and a court-ordered TRO. See *Allen v. Wright*, 468 U.S. 737, 751 (1984) (causation requires injury to be fairly traceable to challenged action). The injuries are redressable by judicial relief compelling NSF to restore its normal review process. See *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181–82 (2000) (redressability satisfied where relief will likely remedy injury).

75. **Irreparable Harm.** Plaintiff will suffer irreparable harm absent injunctive relief. Once the opportunity to disseminate the intervention and train younger researchers is lost, it cannot be restored by monetary damages or post-hoc remedies. The harms include disruption of ongoing studies, reputational injury, and deprivation of public benefits Congress expressly mandated NSF to advance. Courts have consistently recognized that loss of unique opportunities, reliance interests, and constitutional rights constitutes irreparable harm. See *Winter*, 555 U.S. at 22 (irreparable harm must be likely, not merely possible); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (career disruption and reputational injury may constitute irreparable harm); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of First Amendment freedoms, even for minimal periods, constitutes irreparable injury).

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1     76. **Balance of** Equities. The balance of equities tips sharply in Plaintiff's favor. Plaintiff faces

2         immediate and irreparable harm, while Defendants suffer no legally cognizable harm from being

3         required to comply with the APA, NSF regulations, and a court-ordered TRO. See *Amoco Prod. Co.*

4         *v. Village of Gambell*, 480 U.S. 531, 542 (1987) (equitable relief appropriate where harm to

5         plaintiffs outweighs speculative harm to defendants). Preserving Plaintiff's reliance and expectation

6         interests built through decades of federally supported research outweighs any asserted

7         inconvenience to Defendants.

8     **77. Public Interest.** Granting injunctive relief serves the public interest. Congress expressly mandated

9         that NSF advance racial equity in STEM education and workforce development. Blocking proposals

10        recommended for funding undermines this mission, deprives students and educators of public

11        benefits, and erodes confidence in the integrity of federal research funding. See *Nken v. Holder*, 556

12        U.S. 418, 435 (2009) (public interest is served by ensuring that government agencies act lawfully);

13        *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (public interest served by

14        enforcing statutory rights). Judicial relief will safeguard both the constitutional separation of powers

15        and the public welfare benefits Congress intended, ensuring that research designed to advance equity

16        in STEM education is not lost to unlawful executive interference.

17     **78. Injunctive Relief Matrix: Legal Standards and Case Application**

18         This matrix demonstrates that Plaintiff satisfies all four prongs of the *Winter*

19         injunction test—Standing, Irreparable Harm, Balance of Equities, and Public

20         Interest—by aligning controlling precedent with the specific facts of this case.

21         1. Standing

22         **Legal Standards – Injury-in-Fact**

23     • Injury must be concrete, particularized, and actual or imminent (*Lujan v. Defenders of Wildlife*, 504

24     U.S. 555, 560–61 (1992)).

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    • Reliance and expectation interests are protectable (*Perry v. Sindermann*, 408 U.S. 593, 601
2    (1972)).

3    **Case Application – Injury-in-Fact**

4    • Plaintiff lost the opportunity to disseminate a proven intervention.

5    • Ongoing studies disrupted.

6    • Inability to train younger researchers beyond the lifetimes of PI Norman (80) and co-PI Shelley
7    (70).

8    • Reputational injury.

9    • Deprivation of public benefits Congress mandated NSF to advance.

10    79. **Legal Standards – Causation**

11    • Injury must be fairly traceable to challenged action (*Allen v. Wright*, 468 U.S. 737, 751 (1984)).

12    • Agency action beyond statutory authority is ultra vires (*City of Arlington v. FCC*, 569 U.S. 290,
13    297 (2013)).

14    • **Case Application – Causation**

15    • Injuries trace directly to Trump's Executive Orders, DOGE directives, and NSF's implementation
16    of those directives by blocking a proposal formally recommended for funding.

17    • **Legal Standards – Redressability**

18    • Relief must likely remedy injury (*Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181–82 (2000)).

19    • Arbitrary agency action may be vacated (*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43
20    (1983)).

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   • **Case Application – Redressability**

2   • Judicial relief—vacatur and remand to NSF's Division of Grants and Awards—would restore the

3   review process, enable training of younger researchers, and preserve dissemination of the

4   intervention.

5   • 2. Irreparable Harm

6   • **Legal Standards**

7   • Harm must be likely, not merely possible (*Winter v. NRDC*, 555 U.S. 7, 22 (2008

8   • Career disruption and reputational injury may constitute irreparable harm (*Sampson v. Murray*, 415

9   U.S. 61, 90 (1974)).

10  • Loss of First Amendment freedoms is irreparable (*Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

11  • Reliance interests are protectable (*Perry v. Sindermann*, 408 U.S. 593, 601 (1972)).

12  • Denial of statutory rights and public benefits constitutes irreparable harm (*League of Women*

13  *Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).

14  80. **Case Application**

15  81. Blocking the proposal has already deprived Plaintiff of dissemination and training opportunities;

16  once lost, cannot be restored by damages.

17  82. Plaintiff's career and institutional standing are damaged in ways not compensable by money.

18  83. Students and educators are denied benefits Congress mandated NSF to advance; harm extends

19  beyond Plaintiff to the public.

20  84. The inability to train younger researchers is time-sensitive and irreversible.

21  85. 3. Balance of Equities

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    **86. Legal Standards**

2    87. Courts must balance competing claims of injury (*Winter*, 555 U.S. at 24).

3    88. Equitable relief appropriate where harm to plaintiffs outweighs speculative harm to defendants

4       (*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). The test for whether a

5       preliminary injunction is appropriate requires determining whether the plaintiff is likely to succeed

6       on the merits, whether the plaintiff is likely to suffer irreparable harm without the injunction,

7       whether the balance of equities and hardships is in the plaintiff's favor, and whether an injunction

8       is in the public interest

9    **89. Case Application**

10    90. Plaintiff faces immediate irreparable harm from Defendants' unlawful blocking of a proposal

11       formally recommended for funding.

12    91. Defendants suffer no cognizable harm from being required to comply with APA, NSF regulations,

13       and a court-ordered TRO.

14    92. Preserving Plaintiff's reliance and expectation interests outweighs permitting Defendants to

15       continue unlawful interference with Congress's appropriations and NSF's mission.

16    93. 4. Public Interest

17    **94. Legal Standards**

18    95. Public interest served by enforcing statutory rights (*League of Women Voters v. Trump*)

19    **96. Case Application**

20    97. Plaintiff faces immediate irreparable harm from Defendants' unlawful blocking of a proposal

21       formally recommended for funding.

22    98. Defendants suffer no cognizable harm from being required to comply with APA, NSF regulations,

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   and a court-ordered TRO.

2   99. Preserving Plaintiff's reliance and expectation interests outweighs permitting Defendants to

3      continue unlawful interference with Congress's appropriations and NSF's mission.

4   100.    4. Public Interest

5   101.    **Legal Standards**

6   102.    Public interest is served by ensuring agencies act lawfully (*Christensen v. Harris County*,

7      529 U.S. 576 (2000)).

8   103.    Public interest served by enforcing statutory rights (*League of Women Voters v.*

9   104.    Cir. 2016)).

10  105.    Courts safeguard separation of powers and lawful use of taxpayer funds (*Nken v. Holder*,

11     556 U.S. 418, 435 (2009)).

12  106.    **Case Application**

13  107.    Judicial relief ensures NSF follows lawful procedures and honors congressional mandates.

14  108.    Relief restores lawful, merit-based review processes and protects dissemination of

15     interventions closing STEM achievement gaps.

16  109.    Relief prevents executive overreach, preserves congressional authority, and ensures

17     taxpayer funds serve their intended public purpose.

18

19  110.    Plaintiff satisfies all three elements of Article III standing. First, Plaintiff has suffered a

20     concrete, particularized, and ongoing injury-in-fact. After decades of collaboration with NSF—

21     including multiple prior awards supporting the development of an intervention tool now recognized

22     by expert reviewers as "innovative and tested"—Plaintiff's proposal was formally recommended for

- 28 -

1    funding under the RESTEM program. Defendants' unlawful decision to block that recommendation

2    extinguished Plaintiff's reliance and expectation interests built through years of federally supported

3    research.

4    111.    Here is how this injury-in-fact is particularized to the Plaintiff. The research grant

5    recommended for funding but illegally blocked for funding by Defendants is part of a research project

6    which Plaintiff has been working on with NSF funding since 1999. In 1999 Plaintiff was awarded the

7    most prestigious award in the NSF Directorate for Education and Human Resources (EHR) when he

8    was awarded an Early Career award totaling $.6 million. The aim of that project was to develop an

9    intervention that would boost the performance of Back students so as to eliminate the Black-White

10    STEM test score gap. In 2009 Plaintiff was awarded another NSF $.4 million award to continue his

11    research on developing an intervention. In 2014 Plaintiff tested that intervention that Plaintiff had

12    developed. This is the intervention that the expert reviewers has described as a tested intervention that

13    improves not only the performance of black students, but the performance of all students. Plaintiff

14    had a reasonable reliance interest based on the belief that the NSF had worked with him for all these

15    years, and he had succeeded in developing an intervention that has a potential to eliminate the learning

16    opportunity gap.

17    112.    The NSF regulations also state in fact that special considerations will be given to proposals that

18    provide unique solutions to problems defined as priorities. This lost opportunity to disseminate this

19    effective intervention means that Plaintiff's work has been in vain. This is a very concrete, long-term

20    and ongoing harm. It is also a very particularized harm given the specific context of this research

21    project. The blocked funding prevents the realization of public benefits intended for thousands of

22    students, educators, and community stakeholders. These harms to protected rights are not speculative;

23    they are immediate, continuing, traceable to Defendants' actions, and redressable by the relief sought.

24    The reliance and expectation interest in the recommended funding is grounded in NSF's formal review

25    and recommendation process and is sufficient to establish Plaintiff's Title 3 standing required to

26    trigger jurisdiction. It should be noted that the development of an intervention to increase Black

1    participation in stem is an explicitly mandated mission from Congress to the NSF. The NSF

2    determination now that the developed intervention does not advance agency priorities is not supported

3    by their past actions and runs counter to the stated published NSF mission. NSF actions in this matter

4    amounts to a contempt of court as NSF has been barred by court TRO from blocking or impeding the

5    normal NSF review process. Impeding and interfering with the normal published NSF review process,

6    is exactly what NSF has done in this matter.

7    113.          In terminating proposals already recommended for funding, Federal

8    Agency Defendant NSF acted recklessly in disregarding the law, failing to consider Plaintiff's

9    reliance and expectation interests, and failing to consider the harm resulting from immediately

10    stopping ongoing research studies. On average, it takes about three unsuccessful attempts before

11    proposers get their proposals funded by NSF. In our case it took us four attempts before we got

12    recommended for funding in 2025. The illegal denial of funding to a recommended proposal

13    violates Plaintiffs' legally protected expectation interests. NSF's formal recommendation process

14    creates a legitimate expectation of funding, particularly when the proposal meets Congressionally

15    mandated priorities and is not rejected for any procedural or substantive deficiency. Blocking such

16    a proposal from full consideration constitutes arbitrary and capricious agency action in violation of

17    the APA and infringes upon First Amendment rights where the proposal is rejected because it

18    contains 'language that includes terms such as "diversity," "equity," and "inclusion."

19    114.    The denial has immediately disrupted ongoing studies, foreclosed dissemination of an

20    intervention designed to eliminate the achievement gap, damaged Plaintiff's professional reputation,

21    diverted institutional resources, and deprived thousands of students and educators of anticipated

22    public benefits. These harms are neither speculative nor generalized; they are specific to Plaintiff's

23    unique reliance on NSF's established practices.

24    115.    Second, Plaintiff's injuries are directly traceable to Defendants' conduct. The blocked

25    recommendation did not result from NSF's ordinary exercise of discretion but from Defendants'

26    interference with the agency's merit-based review process, in defiance of the Administrative

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Procedure Act, NSF regulations, and a court-ordered TRO. But for Defendants' unlawful actions, Plaintiff's proposal—formally recommended for funding after rigorous expert review—would have proceeded through NSF's normal administrative channels, enabling continuation of research, dissemination of the tested intervention, and realization of the public benefits Congress expressly mandated NSF to advance.

116.    Third, Plaintiff's injuries are redressable by the relief sought. Vacatur of Defendants' unlawful action and an injunction compelling NSF to resume its normal review process would restore Plaintiff's proposal to its proper procedural posture, allowing the recommendation to advance to funding consideration by the Division of Grants and Agreements. Such relief would remedy the disruption of ongoing research, restore Plaintiff's professional and institutional standing, and ensure that the intervention tool reaches the students and educators it was designed to benefit. Because the requested judicial relief would directly address and cure the harms caused by Defendants' unlawful interference, Plaintiff meets the injury-in-fact, causation, and redressability requirements necessary to establish Article III standing.

117.    The illegal denial of funding to a recommended proposal violates Plaintiffs' legally protected expectation interests. NSF's formal recommendation process creates a legitimate expectation of funding, particularly when the proposal meets Congressionally mandated priorities and is not rejected for any procedural or substantive deficiency. Blocking such a proposal constitutes arbitrary and capricious agency action in violation of the APA and infringes upon First Amendment rights where the proposal is rejected because it contains 'language that includes terms such as "diversity," "equity," and "inclusion."

118.    The injury is not limited to the researchers. It extends to the institutions, communities, and public beneficiaries of the proposed intervention. STEMLIFE's ability to fulfill its public mission is compromised. The blocked funding threatens layoffs, reduced research output, and the loss of public benefits intended for thousands of students and educators. These harms are direct, traceable to Defendants' conduct, and remediable by judicial intervention.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

**C. Jurisdiction Is Proper and Relief Is Warranted**

119.    The distinction between terminated awards and blocked recommendations is legally irrelevant. Both actions result in unlawful interference with NSF's merit-based funding process and produce injuries. The Ninth Circuit has recognized standing in protected property interest cases involving terminated grants, and the same rationale applies here with respect to protected reliance interest under APA. The Federal Department of Trade's own advisory confirms that the TRO applies to future grants not yet awarded, affirming the court's jurisdiction to enjoin Defendants' conduct.

120.    In sum, the denial of funding has caused non-conjectural harm to Plaintiffs and to society at large. The injuries are concrete, particularized, and redressable. Plaintiffs have standing, and the court has jurisdiction to grant the relief sought.

121.    Plaintiffs' reliance interests in the NSF funding process are substantial and legally protected. The proposal was submitted in accordance with NSF's published guidelines and priorities and was formally recommended for funding by expert reviewers. Plaintiffs reasonably relied on this recommendation to plan research activities, allocate institutional resources, and engage community partners. This reliance was not speculative—it was based on NSF's established procedures and the expectation that meritorious proposals would be funded absent arbitrary interference. The sudden reversal by Defendants undermines this reliance, causing disruption to ongoing research, reputational harm, and financial instability. Courts have recognized that reliance on agency procedures and recommendations creates a legitimate expectation interest sufficient to establish standing and trigger jurisdiction as was the case in *Thakur v Trump*.

**D. Irreparable Harm and Need for Injunctive Relief**

122.    Unless it is enjoined, Defendants' actions will continue to cause irreparable harm to Plaintiff and the broader research community. The denial of funding undermines the integrity of the NSF's scientific mission, disrupts equity-focused research, and deprives the public of innovations and interventions designed to close achievement gaps in STEM education. Judicial intervention by way

1    of injunctive relief is necessary to restore the funding pathway and prevent further damage.

## THE PARTIES

### A.    Plaintiff

123.        Individual Plaintiff Dr Obed Norman is the Plaintiff PRO SE suing in his PERSONAL capacity as lead collaborative Principal Investigator (PI) and not as President of STEMLIFE. STEMLIFE is a Maryland Education Research nonprofit and the lead institution in the collaborative grant proposals (2500795 and 2500796) which are at issue in this case. Plaintiff Norman and his Iowa State University colleagues applied for a REALSTEM $5 million collaborative grant from the National Science Foundation (NSF) on October 10, 2024. Norman is a United States citizen and resident of Baltimore City, Maryland.

### B.    Defendants

124.    DONALD J. TRUMP, in his official capacity as President of the United States;

125.    DEPARTMENT OF GOVERNMENT EFFICIENCY

126.    AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency.

127.    NATIONAL SCIENCE FOUNDATION.

128.    BRIAN STONE, in his official capacity as Acting Director of the NSF.

129.    LEE ZIA, in his official capacity as Deputy Division Director NSF, Division of Undergraduate Education.

130.    LEAH MCALISTER-SHIELDS, in her official capacity as Cognizant Program Officer, NSF Division of Undergraduate Education

131.    JAMES L. MOORE, III, NSF, in his official capacity as Director of the Directorate for Education and Human Resources.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

I.      **Plaintiff Dr. Obed Norman has, through decades of federal**
        **funding, made a significant contribution to research that**
        **benefits the public and effectuates NSF priorities.**

132.    Norman has an extensive history with grant awards from the NSF. In 1998 PI Norman was awarded the Early Career NSF award, which is the most prestigious award in the NSF EHR Division.

133.    With that early award, he tackled the important problem of the test score gap between white students and black students. In studying the test score gap, PI Norman extended his project to include not only the gap between white and black students but also the gap that exists between Asian and white students and the gap that exists between US-born STEM students and H1B visa applicant students. Kathleen McCartney, former Dean of the Harvard Graduate School of Education and past president of Smith College, stated the test score gap is the single most pressing problem in education. Noted Harvard sociologist Christopher Jencks said this problem needs urgent action and solution  because solving it is necessary and sufficient to reduce racial inequalities in education attainment and earnings. Some economic estimates are that solving this problem will add 760 billion dollars to the US economy yearly. Jencks said that this problem needs urgent solving but 'Unfortunately, we do not have a detailed blueprint for reducing the black-white test score gap, and neither does anyone else'. PI Norman had developed a solution for this problem with his Early Career NSF award through a tested intervention which has the potential to benefit all students in that it will eliminate all those gaps and at the same time elevate or enhance the academic performance of all students. The returned proposal submitted on October 5, 2024 is described by the NSF expert reviewers as follows:

> 'The project's intervention tool provides an innovative and tested approach to address the "learning opportunity gap" between Black and White students, as demonstrated through the testing scores. • The elimination of 'high-stakes' tests in biology classes as part of the intervention tool, while still demonstrating academic achievement, has the potential to be used in other STEM education

1    disciplines and institutions.

2    The success of the project's intervention tool model can be
3    duplicated at other institutions, eventually increasing Black
4    representation in the STEM teaching workforce and STEM careers
5    in general. This study proposes implementing the study with
6    potentially 60,000 participants and approximately 500 instructors
7    participating by year five. If this works out, it will significantly
8    strengthen the broader impact for instructors and students alike.

9    The project will be conducted at both HBCUs [Historically Black
10   Colleges and Universities] and PWI [Predominantly White
11   Institutions] education institutions'.

12

13   134.    For the NSF and the nation, the return on investment in PI Norman's research has been

14   significant. Out of his research an article on the test score gap in the prestigious *Journal of Research*

15   *in Science Teaching* has been cited in just under 300 scholarly publications. An article on scientific

16   literacy has been cited by a team of researchers from Oxford University in the United Kingdom,

17   which in some rankings is considered the number one university in the world. PI Norman's

18   publication on exploring hypotheses on learning has been requested by the University of Paris, the

19   Sorbonne, for inclusion in their collection of important papers on the work of the celebrated French

20   educator Jean Piaget. PI Norman has developed an intervention which has the potential to solve a

21   problem that no one in education has been able to solve for over 70 years. According to the NSF

22   website, proposals most likely to be funded are those that present 'different approaches to significant

23   research and education questions, potential (with perhaps high risk) for transformational advances in

24   a field, capacity building in a new and promising research area, or achievement of special program

25   objectives'. It also states that Program Officers will consider NSF's current proposals and previously

26   funded projects in making their funding recommendations. The expert reviewers of our returned

27   proposal indicate that our proposal more than meets the stated review standards of NSF. The

28   reviewers stated, in part:

29   'The broader impact of this project is based on an innovative and
30   tested approach to address the white-black learning opportunity gap
31   (LOG) in STEM education. By testing and evaluating an
32   intervention to reduce this gap, the project aims to significantly
33   improve academic outcomes for Black students. Also, increasing

- 35 -

Black representation in the teaching workforce can foster equity in education and contribute to better academic outcomes for students, while tackling the challenge of stereotypical threats, which in turn, the improvement of Black student academic performance could lead to higher college graduation rates and large economic benefits, such as closing wage gaps and increasing mean earnings…. The broader impacts of the proposal include a possible blueprint for eliminating the national "achievement gap," which thus far still plagues STEM education. The study also alludes to the benefits pertaining to increasing the national economy by increasing the number of highly educated workers in STEM fields.'

135.    In challenge, we also assert that NSF has no basis for returning the proposal without review on the grounds that the proposal does not effectuate NSF priorities. The NSF has a Congressionally mandated focus on improving diversity in STEM fields. NSF is in clear breach of that Congressional mandate when it rejects our proposal for focusing on diversifying STEM. Congress has instructed in law that a 'core strategy' of NSF's work must be to increase the participation of people who have historically been left out of STEM occupations. Doing so is in the interest of national security and economic development. Even the currently published NSF priorities state that NSF priority remains helping underperforming students improve their STEM academic performance. That also is the main goal of our proposal. The currently stated priority of NSF is that proposals that are exclusively focused on one racial or ethnic group and excluding other ethnic groups are no longer acceptable. While our proposal is focused on students from underrepresented communities so that they can improve their academic performance, the submission makes it clear on page 1 that the focus of this proposal is not exclusively on students from underrepresented communities; it also has a focus on White students and on all students at Historically Black Colleges and Universities (HBCUs) as well as at predominantly White institutions of higher education. Also on page 1, the proposal states clearly that the main component of the intervention that is elaborated in the proposal is the use of retrieval exercises, which have been shown to enhance the learning of students both from underrepresented communities and from non-underrepresented communities such as White students. The intervention is therefore not one that benefits only one group of students or an intervention that helps one group of students at the expense of any other group of students. The intervention is aimed

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  at improving the academic STEM performance of all students, and no students are excluded from

2  the intervention. STEMLIFE, the name of the nonprofit lead institution, stands for STEM Learning

3  Improvement For Everyone. The goal of the intervention requires that the intervention be

4  implemented with students from underrepresented communities and other students who do not fit

5  that category, so we can determine whether the test score gap between these student groups is being

6  reduced or eliminated as is the goal of the proposal. Under the heading Sampling and Recruitment

7  on page 13, the proposal states:

> 'The student population of interest will be primarily, but not
> exclusively, students from under-represented communities (SURC) taking
> introductory college STEM courses and teacher candidates preparing to
> take STEM teacher certification (e.g., PRAXIS). The study sample will be
> selected from HBCUs, as well as predominantly White institutions
> (PWIs), since 90% of students from underrepresented communities
> (SURC) attend PWI's

**136.** **<u>Congress's Power of the Purse Makes Illegal the Return of Plaintiff's Proposal at the President's Direction After It Had Been Recommended for Funding to the DGA</u>**

137.    The partnership between the states and the federal government is a product of Congress's powers, and by design insulated from political winds in the executive branch. Congress has repeatedly emphasized the importance of federally funded research as critical to the strength and security of the nation and has used its powers to set research priorities and appropriate funds to federal agencies to carry out those priorities.

138.    Congress has the constitutional power to appropriate funds for such research and to create agencies necessary to implement federal policies. Article I vests Congress with the legislative power to create departments, agencies, and offices within the executive branch, to define their duties, and to fund their activities. U.S. Const. art. I, §1 ("All legislative Powers herein granted shall be vested in a Congress of the United States.").

139.    Congress's legislative power includes "the establishment of offices… [and]

- 37 -

the determination of their functions." *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S.

Const. art I, § 8, cl. 18. "Administrative agencies are creatures of statute," and do not exist or

have purpose without Congress's direction." (*See Nat'l Fed'n of Indep. Bus v. Dep't of Lab.,*

*OSHA*, 595 U.S. 109, 117 (2022)). Congress thus establishes executive agencies and crafts the

statutes that govern each agency's administration. (*See, e.g.,* 10 U.S.C. §§ 111, 113 (Defense); 16

U.S.C. § 551 (Agriculture); 42 U.S.C. §§ 202, 203 (HHS); 42 U.S.C. §§ 218, 282 (NIH); 42

U.S.C. § 7131 (Energy).

140.    Congress also holds the power of the federal purse. Indeed, Congress's

powers to set the policies of the nation are at their apex when it comes to spending money, as the

Constitution "exclusively grants the power of the purse to Congress, not the President." *City &*

*Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress makes its

priorities clear by appropriating funds to agencies to carry out specified activities.

### President Trump Issues a Flurry of Executive Orders and Creates DOGE, Unlawfully Directing Agencies to Terminate Grants and Return Proposals Recommended for Funding

141.    Beginning on Inauguration Day (January 20, 2025), Defendant Trump

issued a number of broad directives through Executive Orders (EOs). These included demands on

federal agencies to take action to comply with the President's agenda.

142.    In particular, Defendant Trump and his administration explicitly and

implicitly called on federal agencies to "terminate" previously awarded grant funds and prevent

funding of proposals recommended for funding. In so doing, the Administration did not comply

with Congress's prior spending decisions and direction.

For example, Executive Order No. 14151, dated January 20, 2025 and titled

"Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs

the Attorney General and others to "coordinate the termination of all discriminatory

- 38 -

1   programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility'

2   (DEIA) mandates, policies, programs, preferences, and activities in the Federal

3   Government, under whatever name they appear." Additionally, it directs each federal

4   agency head to "terminate, to the maximum extent allowed by law... all 'equity-related'

5   grants or contracts" within 60 days. (Exec. Order No. 14151, *Ending Radical and*

6   *Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20,

7   2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-

8   and- wasteful-government-dei-programs-and-preferencing)

9           143.    EO No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-

10   Based Opportunity," addresses purported "immoral race- and sex-based preferences under the

11   guise of so-called [DEI] or [DEIA]." The order requires the Director of OMB to "[e]xcise

12   references to DEI and DEIA principles, under whatever name they may appear, from Federal

13   acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all

14   'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and

15   technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or

16   activities, as appropriate."

17           144.    According to the Order, DOGE would be "dedicated to advancing the

18   President's 18-month DOGE agenda." *Id.* Although the "DOGE agenda" has never been publicly

19   disclosed, DOGE's targets for ostensible "efficiency" improvements have, in practice, borne

20   considerable resemblance to the Executive agenda manifest in Defendant Trump's EOs.

21           145.    According to DOGE's self-described "Wall of Receipts," as of June 3,

22   2025, federal agencies had terminated over 15,000 grants, totaling roughly $44 billion in

23   "savings."

24           146.    Despite multiple successful legal challenges to President Trump's EOs and

25   related directives,[33] Defendants have unlawfully terminated grants and prevented the funding of

26   proposals recommended for funding.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

147.   This lawsuit arises because, in unilaterally blocking the funding of our proposal without lawful cause after it has been recommended for funding, Defendants are flouting constitutional limits on the Executive's authority; violating the First Amendment's prohibition on viewpoint discrimination; denying due process of law under the Fifth Amendment; ignoring agency-specific statutory directives; and violating the APA.

148.   That these grant terminations and blocking of proposals recommended for funding violate the separation of powers became even clearer on May 28, 2025. Until then, DOGE was headed by Elon Musk. Now, according to the White House Press Secretary, DOGE will be led by "each and every member of the President's cabinet and the President himself, who is wholeheartedly committed to cutting waste, fraud and abuse from our government."[35] There is no longer any illusion that DOGE is more than a proxy for Defendant Trump and his priorities. The White House reiterated that each Cabinet secretary would work with DOGE employees at their agencies so that the "mission of DOGE will continue."[36] The DOGE Trojan Horse has been welcomed inside the gates of the Federal Agency Defendant NSF, and the harms to the research community and Plaintiffs thus will continue and very likely increase.

149.   In adopting, implementing, and enforcing Defendant Trump's "priorities" to illegally terminate grants and block proposals recommended for funding, Defendants have caused and will continue to cause significant concrete harm to Plaintiffs as well as the broader public that benefits from research, discovery, and inventions.

## II.   Agencies that Terminated Grants and Returned Proposals Recommended for Funding Have Acted According to a Common Unlawful Pattern

150.   On information and belief, all Federal Agencies including NSF Defendants similarly and abruptly failed to continue grants pursuant to Congress's directives, instead substituting Defendant Trump's agenda. In place of reasoned decision-making, the federal agencies took direction not only from the flurry of EOs described herein, but in most instances also took direction directly from DOGE staffers, who have no authority to direct or redirect

- 40 -

1    allocation of federal funds. Indeed, in other cases, the United States, per its Department of Justice

2    counsel, has on the record taken the position that Elon Musk—who helmed DOGE until

3    recently—did not occupy an "office," lacked a title conferring formal authority, and was thus

4    beyond judicial review or legal consequence.

5        151.    In terminating proposals already recommended for funding, Federal

6    Agency Defendant NSF acted recklessly in disregarding the law, failing to consider Plaintiff's

7    reliance and expectation interests, and failing to consider the harm resulting from immediately

8    stopping ongoing research studies. On average, it takes about three unsuccessful attempts before

9    proposers get their proposals funded by NSF. In our case it took us four attempts before we were

10   recommended for funding in 2025.

11       152.    Moreover, the Federal Agency Defendant NSF conducted no proper

12   review of grants, instead mass-terminating with form letters those grants they deemed (with no

13   explanation) to no longer "effectuate" agency priorities, notwithstanding that agencies cannot

14   substitute the President's agenda for their congressionally imposed statutory mandates.

15       153.    This Complaint examines the errant grant practices at the NSF Agency

16   that returned our proposal despite the proposal having been recommended for funding—and then

17   describes how this same pattern played out within other Federal Agencies, to the categorical and

18   common detriment of the Plaintiff and his associates.

19       I.    Defendants' mass return of grant proposals recommended for

20           funding was arbitrary and capricious for many reasons, including (but not limited to)

21           the following:

22       a.    The Termination Notices do not provide a reasoned explanation for

23   returned proposals. Rather, the letters sent across all agencies generally state that the proposal

24   being returned no longer "effectuates" or is no longer "in alignment" with Agency priorities.

25   That generic statement is not a reasoned explanation.

26       b.    Research proposals are recommended for funding only after a rigorous and

- 41 -

objective application and review process that necessarily established that funded projects were

meritorious and satisfied relevant criteria. Defendants have failed to provide any reason our

proposal failed to satisfy applicable criteria. The reason that NSF cites for returning our

proposal is false. The NSF statement that our proposal was being returned without review

(RWR) was an outright falsehood. The proposal had been reviewed and found to be 'good and

competitive' by all three expert reviewers. Nowhere in the PAPPG is allowance made for

returning a proposal without review after the proposal had been reviewed. Under the

Administrative Procedures Act (APA), NSF is bound by law to act in compliance with its own

stated PAPPG. That false statement by NSF is therefore also in clear breach of the PAPPG. Our

proposal was returned after a full review, which confirmed it met NSF priorities, the solicitation

requirements, and standards for intellectual merit and broader impact. The expert reviews were

preceded by an initial determination of compliance and appropriateness by NSF staff and

accompanied by further staff scrutiny for appropriateness and compliance during the expert

review stage. Proposals are not sent for expert review without prior and concurrent

determination by NSF staff that the proposals effectuate NSF priorities.

### III. Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests

154.    NSF was created after World War II when it became clear that federally

funded scientific research was key to the nation's national security interests. Describing it as an

Act "[t]o promote the progress of science; to advance the national health, prosperity, and welfare;

to secure the national defense; and for other purposes," Congress established NSF in 1950

through enacting the National Science Foundation Act of 1950 (the "Act"). Public Law 81-507

(codified at 42 U.S.C. § 1861 et seq.).

155.    The NSF's core function is making grants to fund innovative scientific

research. The NSF awards grants through an apolitical merit review process, under which panels

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

of disinterested scientific experts vet grant applications and make award decisions. The NSF's

merit review process is often referred to as the "gold standard" of scientific review, and NSF-

funded research has contributed to some of the most important scientific advances of the past 70

years.

156.     The Act arose out of the growing awareness during World War II that

science was crucial to the Unites States' national interest and security, as science was key to the

Allied successes in the war. Indeed, during World War II, federal government support of

scientific research accelerated dramatically, and a growing consensus emerged in favor of

continuing government support of basic scientific research after the end of the war.

157.     The NSF's statutorily defined mission "is to provide Federal support for

basic scientific and engineering research, and to be a primary contributor to mathematics, science,

and engineering education at academic institutions in the United States." 42 U.S.C. §

1862k(a)(6)(A).

158.     The Act establishes a series of core "functions" for the NSF. Chief among

them, the Act authorizes and directs the NSF to "initiate and support basic scientific research in

the mathematical, physical, medical, biological, engineering, and other sciences," as well as

"specific scientific research activities in connection with matters relating to the national defense."

159.     The Act also directs the NSF to provide "grants, loans, and other forms of

assistance" to support scientific research" and award "scholarships and graduate fellowships in

the mathematical, physical, medical, biological, engineering, and other sciences."

160.     The Act has been amended at various times since 1950. Since at least 1980,

Congress has recognized that for the United States to maintain its competitive edge, it would need

to encourage and prepare people from groups traditionally underrepresented in STEM to acquire

skills and pursue careers in science and engineering fields. Congress consequently declared that

"the highest quality science over the long-term requires substantial support, from currently

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    available research and education funds, for increased participation in science and technology by

2    women and minorities." Pub. L. 96-516, § 32. Congress later *expanded* this declaration to include

3    increasing participation for people with disabilities. 42 U.S.C. § 1885(b). The importance of

4    STEM to the interests of the United States prompted Congress, in 1980, to prescribe a national

5    policy to promote "full use of the human resources of the Nation" in STEM fields:

> The Congress declares it is the policy of the United States to
> encourage men and women, equally, of all ethnic, racial, and
> economic backgrounds to acquire skills in science and mathematics,
> to have equal opportunity in education, training, and employment in
> scientific and technical fields, and thereby to promote scientific
> literacy and the full use of the human resources of the Nation in
> science and technology. Pub. L. 96-516 § 32.

In other words, Congress has consistently acted to consciously *expand* STEM access rather than

to narrow it, by affirmative outreach to groups not traditionally invited or encouraged to

contribute to STEM initiatives.

161.    One such act was the National Science Foundation Authorization Act of

1998 (the "1998 Amendment"). The 1998 Amendment to the Act reaffirmed the NSF's statutory

commitment to making the United States a leader in STEM fields, and it set as long-term goals

for the NSF to provide leadership to:

a.    enable the United States to maintain a position of world leadership

in all aspects of science, mathematics, engineering, and technology;

b.    promote the discovery, integration, dissemination, and application

of new knowledge in service to society; and

c.    achieve excellence in United States science, mathematics,

engineering, and technology education at all levels. 42 U.S.C. § 1862k(a)(6)(B).

162.    Pursuant to these congressional directives, much of the NSF-funded

research at universities has, for decades, supported the participation in STEM fields by women,

minorities, and people with disabilities.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

163. Notably, the 1998 Amendment sets forth several "core strategies" for achieving the above goals, which include a focus on ensuring diversity in entrants to STEM fields: "Develop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1).

164. The Act was again amended in 2007 as part of the "America COMPETES Act," which sought to bolster the competitiveness of the United States in scientific research and innovation. It instructed the NSF to "give priority" in granting awards to research activities "that can be expected to make contributions in physical or natural science, technology, engineering, social sciences, or mathematics, or that enhance competitiveness, innovation, or safety and security in the United States." 42 U.S.C. § 1862o-5(b).

165. The NSF seeks to fulfill its mission chiefly by issuing competitive, limited-term grants in response to specific proposals from researchers and research organizations. The NSF receives over 50,000 such proposals each year, and funds about 10,000 of them.

166. The NSF employs a merit review process in which reviews of grant applications are carried out by panels of independent scientists, engineers, and educators who are experts in the relevant scientific field, and they are vetted to avoid conflicts of interest. Reviewers judge grant applications for both "intellectual merit" and "broader societal impact."

167. NSF grants are highly competitive and prestigious, and its pre-January 20, 2025 merit review process is often credited for the profound success of the NSF throughout its history. Indeed, it is no exaggeration to say that the world as we know it today would not exist.

IV. **In Response to Trump Administration Directives, NSF Improperly Changed Priorities, Canceled Existing Grants, and Returned Proposals Recommended for Funding.**

168. The foregoing paragraphs describe the NSF as it existed and functioned through the decades, from its original founding until January 20, 2025.

- 45 -

169.    The NSF is now facing an existential threat: the Trump Administration has negated the NSF's core grant-making function by unilaterally, arbitrarily, and illegally terminating billions of dollars in lawfully awarded scientific grants that the Administration views (often mistakenly) as having some connection to diversity, equity, and inclusion (most broadly defined), as well as other subjects the Trump Administration dislikes, such as climate change, vaccines, HIV/AIDS, and COVID-19.

170.    At Defendants Trump's and DOGE's direction, NSF has taken aim at the pillars sustaining the United States' STEM preeminence. These actions violate the law and jeopardize America's longstanding global leadership in STEM. NSF has announced that it will no longer abide by Congress's longstanding mandates.

171.    Since the Trump Administration took office in January 2025, the NSF has terminated more than a billion dollars in scientific grants that had previously been approved and awarded through the merit review process and which the NSF was legally obligated to provide. NSF has also returned without funding a steadily increasing number of proposals that were recommended for funding. The pace of the terminations has escalated rapidly since mid-April, as the Trump Administration has taken a wrecking ball to the NSF. During that brief time period, more than 1,400 grants have been terminated. NSF terminated over 430 grants *in one week*.[105] The grant terminations were generally not preceded by warnings, and thus came as a complete shock to the researchers whose livelihoods and life's work depended on them.

172.    The grant terminations and return of proposals have typically been conveyed in short, standardized missives containing boilerplate statements such as the one we received from Defendant Lee Zia who was not a Cognizant Project Officer. Zia also indicated he was sending the email on behalf of L. Hargraves who, at the time he sent us the email, was no longer at NSF.

> Your proposal was received by the agency. I regret to inform you
> that the U.S. National Science Foundation (NSF) is not considering your
> proposal referenced above for funding.

- 46 -

1    NSF has determined that it does not effectuate NSF program
2    goals or agency priorities. Please see the Update on NSF priorities
3    webpage for further information. If NSF received any reviews on your
4    proposal, those reviews are available to you in Research.gov. Any such
5    reviews were not considered in the agency's decision to return your
6    proposal.

7    If you would like further information concerning this action,
8    please review the NSF Proposal & Award Policies & Procedure Guide
9    Chapter IV.B, the FAQ found on the Update on NSF priorities webpage,
10   or contact the cognizant official whose name and e-mail address are
11   provided below.

12   *173.*    We responded to this email by requesting a reconsideration as described in the PAPPG. On

13   June 14, 2025 we started the application for a reconsideration of our proposal. We sent an email to

14   Defendant Lea McAlister-Shields requesting that she tell us exactly which priorities of the NSF our

15   proposal did not effectuate. McAllister did not answer our question as to which agency priority we

16   did not effectuate. The only information she gave us was that our proposal was returned without

17   review. That was a false statement as our proposal had been positively reviewed before it was

18   returned to us. Defendant McAlister also informed us that the next step in the reconsideration

19   process is that we contact defendant James Moore and we did so on July 14, 2025. According to the

20   PAPPG regulations Moore was supposed to give us a response within 45 days. We contacted him

21   after 53 days and reminded him that he had not responded to our reconsideration request. He never

22   responded. His lack of response was in clear breach of the PAPPG regulation. Defendant Moore's

23   failure to respond means that Plaintiff had exhausted all NSF administrative appeal procedures

24   available to him. See *Sampson v. Murray*, 415 U.S. 61, 90 (1974) *(holding* that injunctive relief is

25   appropriate after a court has determined that administrative appeal procedures had been exhausted,

26   agency action was not procedurally fair, and the court may consider irreparable harm as a factor). In

27   this case the Supreme Court also clarified that reputational injury typically constitutes irreparable

28   harm only when no adequate compensatory relief is available. Plaintiff Norman therefore can claim

29   that he suffered reputational injury that meets the legal definition of irreparable harm.

30   174.    In an apparent attempt to justify its new war on science, the NSF published

31   a "Statement of NSF Priorities" on April 18, 2025, explaining that NSF's activities "must aim to

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

create opportunities for all Americans everywhere" and "[r]esearch projects with more narrow

impact limited to subgroups of people based on protected class or characteristics do not effectuate

NSF priorities."[106] Pursuant to this Directive, NSF began issuing termination notices *en masse* to

research projects, including many designed to implement Congress's express goals of increasing

STEM participation by STEM underrepresented communities.

175.    NSF also issued an accompanying set of FAQ's, which indicated that

awards not aligned with NSF priorities include, but are "not limited to those on diversity, equity,

and inclusion (DEI)."

176.    The grant cancellations are one prong in what can only be described as an

effort to radically shrink and marginalize the NSF. In mid-April it was announced that the NSF

was freezing any new grants, and in early May, the NSF announced that its 37 research divisions

were being abolished. Then, on April 24, 2025, the Director of NSF, Sethuraman Panchanathan,

resigned 16 months early. Massive layoffs are now anticipated. Meanwhile, President Trump

proposed cutting the NSF's budget for the 2026 fiscal year by 55%. As recently stated in *Forbes*,

"This is not reform. It is a dismantling."[107]

177.    It appears that DOGE is behind the unlawful grant terminations at NSF.

*See, e.g.,* Katrina Miller & Carl Zimmer, *National Science Foundation Terminates Hundreds of

Active Research Awards*, New York Times (April 22, 2025) ("Last Wednesday, the magazine

*Science* reported that all new research grants by the agency had been frozen, as ordered by the

Department of Government Efficiency, or DOGE."); Dan Garisto, *Trump Team Freezes New NSF

Awards – And Could Soon Axe Hundreds of Grants*, Nature (Apr. 17, 2025) ("All new research

grants have been frozen at the US National Science Foundation (NSF) — an action apparently

ordered by the Department of Government Efficiency (DOGE) . . . DOGE is also reviewing a list

of active research grants, assessed in February by the NSF, for terms associated with diversity,

equity and inclusion (DEI). It is considering terminating more than 200 of them, NSF staff

members have told *Nature*.").

- 48 -

178.     Indeed, on May 13, 2025, Alondra Nelson, the Harold F. Linder Professor at Princeton University's Institute for Advanced Study, resigned her prestigious position on the National Science Foundation's board of directors. Explaining her decision to *Time Magazine*, she said: "Last week, as the Board held its 494th meeting, I listened to NSF staff say that DOGE had by fiat the authority to give thumbs up or down to grant applications which had been systematically vetted by layers of subject matter experts. Our closed-to-the-public deliberations were observed by Zachary Terrell from the DOGE team. Through his Zoom screen, Terrell showed more interest in his water bottle and his cuticles than in the discussion."[108]

179.     These grant terminations and return of meritorious proposals are a disaster for the future of science in the United States. The gravity of the situation and illegality of the grant terminations were summarized in a letter from the House of Representatives' Committee on Science, Space, and Technology sent to the acting director of the NSF, Brian Stone, on May 8, 2025. The letter characterizes the Trump Administration's actions against the NSF as "chaos and destruction," and states that "[DOGE's] accusation that these terminated awards lack merit is a lie, as most, if not all these awards, carry a statement from the agency declaring that the award "reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria.'"[109]

180.     The House Committee Letter goes on to state:

"The cancelation of these awards suggests instead that NSF is willing to apply political censorship of awards under direction from President Trump and the DOGE teenagers, which is a clear violation of the statutory mission of the agency." *Id.*

It then provides a few examples of recently terminated grants to illustrate the folly, harmfulness, and in some instances absurdity of the Trump Administration's grant cancellations. [109] Letter from House of Representatives' Committee on Science, Space and Technology to Brian Stone (May 8, 2025), https://democrats-

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

science.house.gov/imo/media/doc/2025-05-

08%20Letter%20to%20Acting%20Director%20Stone.pdf.

181.    The chaos and destruction was also evident in the extent to which NSF actions in this matter

have been blatantly and egregiously in breach of the PAPPG in many ways. The Cognizant Program

Officer (CPO) had illegally removed Proposal 2500795 from the list of proposals awaiting decisions

on research.gov. The proposal was only placed back on the list after PI Norman raised the matter

online. Despite repeated requests, the CPO has yet to tell us which specific NSF priority our

proposal does not effectuate. Chapters 2b and 4.1 of the PAPPG outline specific reasons, but we

have not yet been told which requirements or new priorities we have breached.

**CLAIMS FOR RELIEF**

**182.    Count I – Violation of the Administrative Procedure Act (5 U.S.C. §§ 701–706)**

1. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth

    herein.

2. The Administrative Procedure Act requires that agency action not be arbitrary, capricious, an abuse

    of discretion, or otherwise not in accordance with law; contrary to constitutional right; in excess of

    statutory jurisdiction, authority, or limitations; or undertaken without observance of procedure

    required by law. 5 U.S.C. § 706(2).

3. Plaintiff's proposal to the NSF RESTEM program was formally recommended for funding by expert

    reviewers after rigorous merit-based evaluation. Defendants unlawfully blocked the recommendation,

    disregarding NSF's own regulations, established practices, and reliance interests, and in direct

    violation of a court-ordered Temporary Restraining Order prohibiting interference with NSF's review

    process.

- 50 -

4. Defendants failed to consider relevant factors, including Plaintiff's reliance on decades of NSF collaboration, the Congressionally mandated priority of advancing racial equity in STEM education, and the immediate harms caused by disrupting ongoing research. Defendants offered no reasoned explanation for their action, and their decision runs counter to the evidence before the agency.

5. Defendants' conduct constitutes arbitrary and capricious agency action, an abuse of discretion, and action not in accordance with law under 5 U.S.C. § 706(2)(A). It further exceeds statutory authority and violates constitutional separation of powers by encroaching upon Congress's appropriation authority.

6. As a direct and proximate result of Defendants' unlawful action, Plaintiff has suffered concrete, particularized, and ongoing harms, including disruption of research, reputational injury, career disadvantage, and deprivation of public benefits intended for students and educators.

7. Plaintiff is entitled to declaratory and injunctive relief vacating Defendants' unlawful action and compelling NSF to resume its normal review process, as well as attorney's fees and costs under 28 U.S.C. § 2412.

**183.    Count II – Constitutional Violation (Separation of Powers / Appropriations Clause)**

1. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

2. The Constitution vests Congress with exclusive authority over appropriations. U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). The Executive Branch may not encroach upon this power by blocking or diverting funds that Congress has appropriated or by interfering with the lawful processes Congress has established for disbursement.

3. Congress expressly mandated that the National Science Foundation advance racial equity in STEM education and workforce development, and appropriated funds to support NSF's merit-based grant programs, including the RESTEM program. NSF regulations implement this mandate by prioritizing proposals that provide unique solutions to systemic inequities.

4. Plaintiff's proposal was formally recommended for funding after rigorous expert review. Defendants' decision to block the recommendation was not an exercise of lawful discretion but an ultra vires act of executive interference with NSF's Congressionally mandated funding process.

5. By overriding NSF's established review procedures and preventing appropriated funds from being lawfully considered for disbursement, Defendants usurped Congress's exclusive appropriation authority and violated the separation of powers.

6. Defendants' actions further contravened a court-ordered Temporary Restraining Order barring interference with NSF's proposal review process, compounding the constitutional violation by disregarding judicial authority.

7. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff has suffered concrete and particularized harms, including disruption of ongoing research, reputational injury, career disadvantage, and deprivation of public benefits intended for students and educators.

8. Plaintiff is entitled to declaratory and injunctive relief vacating Defendants' unlawful action, compelling NSF to resume its normal review process, and restoring Congress's appropriation authority, as well as attorney's fees and costs under 28 U.S.C. § 2412.

**184.    Count III – First Amendment Violation (Viewpoint Discrimination)**

1. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

2. The First Amendment prohibits government actors from engaging in viewpoint discrimination by suppressing speech or expression based on disagreement with its content. See *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995).

3. Plaintiff's proposal to the NSF RESTEM program was formally recommended for funding after rigorous expert review. The proposal included language consistent with NSF's Congressionally mandated mission to advance "diversity," "equity," and "inclusion" in STEM education.

- 52 -

4. Defendants unlawfully blocked the recommendation for funding not because of any procedural or substantive deficiency, but because of disagreement with the viewpoint expressed in the proposal's language.

5. By rejecting Plaintiff's proposal on the basis of its references to diversity, equity, and inclusion, Defendants engaged in impermissible viewpoint discrimination, suppressing speech that aligns with NSF's statutory mission and established priorities. The concept of diversity is found in the US Constitution and in the earlier national motto of E PLURIBUS UNUM. So is the concept equity in 'All men are created equal'. And so is the concept of inclusion. The President cannot outlaw the Constitution.,

6. Defendants' conduct constitutes a violation of the First Amendment, as it penalizes Plaintiff for expressing a viewpoint that Congress has expressly directed NSF to promote.

7. As a direct and proximate result of Defendants' unconstitutional action, Plaintiff has suffered concrete harms, including disruption of ongoing research, reputational injury, career disadvantage, and deprivation of public benefits intended for students and educators.

8. Plaintiff is entitled to declaratory and injunctive relief vacating Defendants' unlawful action, compelling NSF to resume its normal review process free from viewpoint discrimination, and awarding attorney's fees and costs under 28 U.S.C. § 2412.

**185.    Count IV – Ultra Vires Agency Action**

1. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

2. Federal agencies may act only within the scope of authority delegated to them by Congress. Actions taken in excess of statutory jurisdiction or contrary to congressional mandates are ultra vires and invalid. See *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

3. Congress expressly mandated that the National Science Foundation advance racial equity in STEM education and workforce development, and appropriated funds to support NSF's merit-based grant programs, including the RESTEM program. NSF regulations implement this mandate by prioritizing proposals that provide unique solutions to systemic inequities.

4. Plaintiff's proposal was formally recommended for funding after rigorous expert review. Defendants' decision to block the recommendation was not authorized by statute, regulation, or NSF practice, but instead constituted an unlawful exercise of power beyond the scope of their delegated authority.

5. By interfering with NSF's established review procedures and preventing appropriated funds from being lawfully considered for disbursement, Defendants acted ultra vires, exceeding their statutory jurisdiction and encroaching upon Congress's exclusive appropriation authority.

6. Defendants' actions further contravened a court-ordered

7. Defendants' actions further contravened a court-ordered Temporary Restraining Order barring interference with NSF's proposal review process, underscoring the absence of lawful authority for their conduct.

8. As a direct and proximate result of Defendants' ultra vires action, Plaintiff has suffered concrete and particularized harms, including disruption of ongoing research, reputational injury, career disadvantage, and deprivation of public benefits intended for students and educators.

9. Plaintiff is entitled to declaratory and injunctive relief vacating Defendants' unlawful action, compelling NSF to resume its normal review process, and awarding attorney's fees and costs under 28 U.S.C. § 2412.

186.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in Plaintiff's favor and grant the following relief:

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1. **Declaratory Relief**: Declare that Defendants' actions blocking Plaintiff's proposal after formal recommendation for funding were unlawful, arbitrary, and capricious under the Administrative Procedure Act, ultra vires, and unconstitutional.

2. **Injunctive Relief**: Enjoin Defendants to immediately restore and resume the National Science Foundation's normal merit-based review process, free from unlawful interference, and permit Plaintiff's proposal to advance from formal recommendation to full funding consideration by the Division of Grants and Agreements.

3. **Prohibitory Relief**: Permanently prohibit Defendants from blocking, delaying, or otherwise disrupting NSF's established review procedures in violation of statutory, regulatory, or constitutional limits.

4. **Vacatur**: Vacate Defendants' unlawful action and restore Plaintiff's proposal to its proper procedural posture within NSF's review process.

5. **Attorney's Fees and Costs**: Award Plaintiff reasonable attorney's fees and costs pursuant to 28 U.S.C. § 2412.

10. **Further Relief**: Grant such other and further relief as the Court deems just and proper to redress the harms suffered and safeguard the integrity of NSF's Congressionally mandated mission.

**187.    CONLUSSION**

Defendants' unlawful interference with the National Science Foundation's merit-based review process has inflicted concrete, particularized, and irreparable harm on Plaintiff, his collaborators, and the public. By blocking a proposal formally recommended for funding, Defendants have undermined decades of federally supported research, disrupted ongoing studies, damaged professional reputations, and deprived students and educators of the public benefits Congress expressly mandated NSF to advance.

This conduct violates the Administrative Procedure Act, contravenes NSF

- 55 -

1    regulations, disregards a court-ordered Temporary Restraining Order, and encroaches upon

2    Congress's exclusive appropriation authority. It exemplifies arbitrary and capricious agency action

3    undertaken ultra vires, in service of political directives rather than statutory mandates.

4           The Constitution requires that agencies act within the bounds of congressional

5    authority, and the APA requires reasoned, lawful decision-making. The public interest demands

6    that taxpayer funds be used for their congressionally authorized purposes, that merit-based research

7    processes be preserved, and that interventions designed to advance racial equity in STEM education

8    not be lost to unlawful executive interference.

9           Accordingly, Plaintiff respectfully urges this Court to grant declaratory and

10    injunctive relief, vacate Defendants' unlawful action, and compel NSF to restore its normal review

11    process. Such relief will safeguard the separation of powers, protect reliance and expectation

12    interests built through decades of research, and ensure that the benefits of Plaintiff's work are

13    disseminated to future generations of researchers and the public at large.

14           Our case at bar is indistinguishable from <u>Thakur et al v. Trump et al | United States</u>

15    <u>District Court, Northern District of California</u> (case # 3:25-cv-04737-RFL). Plaintiffs in that case

16    prevailed on their motion for injunctive relief and the 9th Circuit in a published opinion THAKUR V.

17    TRUMP, No. 25-4249 (9th Cir. 2025) affirmed the lower federal court order. Accordingly our prayer to

18    this court rests on firm case law and should be granted.

19           Respectfully submitted,

20    _____

21    Obed Norman

22    PLAINTIFF PRO SE

23    3010 St Paul Street

24    Apt 2

- 56 -

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Baltimore MD 21218

Telephone: 4436481028

Email: onorman6@gmail.com

# Certification and closing

Under Federal Rules of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint; (1) is not being presented for an improper purpose, such as to harass, course, unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law, or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of rule 11.

**For Pro Se Parties**

I agree to provide the Clerk's office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's office, may result in the dismissal of my case.

Date of signing: October 14, 2025

Signature of plaintiff:    _/s/ Obed Norman_    Printed name of plaintiff: Obed Norman

                                        Telephone: 4436481028
Email: onorman6@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on          I served a copy of the foregoing Complaint for

Declaratory and Injunctive Relief on all Defendants by certified mail to their official addresses

as required by law.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF